# IN THE COURT OF APPEALS OF IOWA

No. 23-1228
Filed October 11, 2023

**IN THE INTEREST OF E.C. and S.H.,**
**Minor Children,**

**M.C., Mother,**
        Appellant,

**H.H., Father,**
        Appellant.
_____

Appeal from the Iowa District Court for Jones County, Joan M. Black, District Associate Judge.

A mother appeals the termination of her rights to two children, and a father appeals termination of his rights to one child. **AFFIRMED ON BOTH APPEALS.**

Annette F. Martin, Cedar Rapids, for appellant mother.

Judith Jennings Hoover of Hoover Law Office, P.C., Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Mackenzie L. Moran, Assistant Attorney General, for appellee State.

Robert W. Davison, Cedar Rapids, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., Buller, J., and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BULLER, Judge.**

A mother appeals the termination of her rights to two children, E.C. and S.H. The father of S.H. separately appeals the termination of his parental rights. On our de novo review, we affirm both appeals. The children cannot return to the care of the mother, who has not demonstrated consistent sobriety or stability. And S.H. cannot return to the care of his father, who has been incarcerated for much of S.H.'s life, including during the termination trial.

## I.      Background Facts and Proceedings

S.H. was born to the mother and H.H. (who we refer to throughout this opinion as "S.H.'s father") in 2009. E.C. was born to the mother and another man in 2019. S.H. has been involved with the juvenile court before as a child in need of assistance (CINA), first in the fall of 2014 and a second time in 2018. E.H. has been involved with the juvenile court as a CINA since she was one month old.

In 2018, the Iowa Department of Health and Human Services (HHS) first became involved with S.H. due to concerns over domestic violence in the home and methamphetamine use by both parents. As the juvenile court put it, S.H.'s father "has an extensive criminal history" that includes offenses related to domestic abuse, controlled substances, operating while intoxicated, violation of no-contact orders, probation violations, and eluding law enforcement. As a result of these offenses, S.H.'s father has been incarcerated for the majority of S.H.'s life and has not been a custodial parent at any point in the last five years.

The mother's criminal history includes operating while intoxicated, eluding, and controlled substances. She has been jailed at multiple points over the years leading up to termination, most recently about three months before trial. Dating

back to 2014, HHS has founded multiple complaints related to the mother and S.H.'s father's substance abuse endangering S.H., E.C., and an older child. One of the mother's arrests in 2018 led to S.H.'s first removal from September 2018 to April 2019.

In March 2020, the State applied to remove both children from the mother's care after she tested positive for methamphetamine and the children's fathers remained incarcerated. Later that year, the court extended the permanency goal. By the next spring, a trial placement of the children with the mother began and appeared to go well.

In April 2022, the State applied for another removal (the third for S.H. and second for E.C.) after the mother took S.H. out of school and fled to Texas with both children following a car crash. E.C. was in the car, and the mother left the scene of the accident. While the mother was evading law enforcement and potential incarceration, she and the children were living in a tent and S.H. missed twenty-three days of school. During the phone hearing on removal, the mother admitted to taking the children out of state because she was facing a jail sentence. The court upheld the removal of both children, ordered the mother to return the children to Iowa, and placed custody of both children with HHS.

The mother returned to Iowa but continued to use and test positive for methamphetamine and marijuana. The mother enrolled in an in-patient program for approximately fifty days but was kicked out of the program when she was found with a "vape" on her person.

During this time, S.H.'s father was released from incarceration and then re-incarcerated but did not engage with services. S.H.'s father attempted some

contact with S.H., but S.H. was not interested. When they did connect by phone, S.H.'s father had to be redirected away from talking about inappropriate things.

In early 2023, a no-contact order was entered between S.H.'s father and the then-case worker after S.H.'s father repeatedly texted inappropriate messages and sent a photo of his penis to the HHS worker. As a result, another case worker was assigned in February 2023. Among other outbursts by S.H.'s father at the termination trial, the juvenile court noted he asserted that the State couldn't prove "it was actually his penis in the photos" sent to the HHS worker.

By the time of a permanency hearing in April, the mother had been released from another stint in jail. S.H.'s father was released from jail the day before the hearing, but his whereabouts were unknown. Recognizing the files had been open for several years, the court directed the State to file petitions to terminate the parents' rights.

At the termination trial, S.H.'s father was jailed awaiting transfer to prison following a guilty plea to eluding, a class "D" felony. He testified regarding his different periods of incarceration during the life of the case. He explained that, although he lived in several different locales when on parole, he had maintained phone calls with S.H. He also blamed the mother for not engaging with services because she "was supposed to get custody back." And he faulted the current placement for his problems communicating with S.H., though he admitted he can be difficult to reach and spent weeks without a phone. He also complained about the new HHS worker assigned after his inappropriate behavior.

The last contact S.H.'s father had with S.H. was five or more months before trial. During some visits, S.H.'s father acted inappropriately by bringing a knife and

swearing. S.H.'s father admitted he was not a placement option for S.H. "right this second" or in the near future. And he criticized S.H.'s current placement as "snotty as hell, like a bitch."

The juvenile court described S.H.'s father's trial testimony as "increasingly agitated" when questioned by the county attorney about his behavior. While complaining about the children's placement, S.H.'s father explained, "I did call her a bitch, because she was acting like a bitch." He concluded his trial testimony with the statement "fuck off" or "fuck this." The juvenile court observed it was unclear whether the expletive was directed at the court or the county attorney. S.H.'s father was removed from the courtroom thereafter.

As for the mother, she had been out of jail less than three months by the time of the termination trial. In the juvenile court's words, the mother was "a poor historian" in terms of chronology. But she did admit to the multiple removals and that the children had not been in her care or in a trial home placement for approximately the year preceding termination. And she blamed eating chocolate at a friend's house for her recent positive marijuana test and claimed to be sober since her late-2022 methamphetamine use.

Despite acknowledging her history of substance abuse and relapse, the mother testified that she was "not the same person" after entering the recovery program (despite not completing it) and her recent participation in Alcoholics Anonymous. In the mother's view, her visits with the children—fully supervised in the months leading up to termination—were going well, with the caveats that S.H. sometimes refused to attend and she believed both HHS and the children's foster

mother were undermining or sabotaging her. One of the mother's friends and an adult child also testified in regard to her recent sobriety and visits with the children.

E.C.'s father testified that E.C. deserved "a better life than what she's been getting" from the mother and him. And he believed E.C.'s current placement gave her the "most consistent love that she has gotten probably throughout her whole life."

The HHS case supervisor relayed that S.H., who was nearly fourteen, did not want to return to his mother because he felt unsafe and wanted to stay with his sister in the current placement for potential adoption. The case supervisor testified S.H. told her that the mother had instructed him to lie about matters related to the juvenile cases. The guardian ad litem (GAL) recommended termination of the mother's rights as to both children and of S.H.'s father as to S.H. The GAL explained that his recommendation was in part based on his conversations with the children, including a lengthy conversation with S.H. the day before trial.

The juvenile court terminated the mother's rights to both children, S.H.'s father's rights to S.H., and E.C.'s father's rights to E.C. These appeals by the mother and S.H.'s father follow. E.C.'s father does not appeal.

## II.     Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). "[W]e may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *Id.* at 707. "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* at 706.

We generally review rulings on a motion for new counsel for an abuse of discretion. *See State v. Lopez*, 633 N.W.2d 774, 778 (Iowa 2001). S.H.'s father does not assert any other standard should apply in the context of termination proceedings, so we apply this general rule. We find an abuse of discretion only where "the [juvenile] court exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* (quoting *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997)).

### III.    Discussion

In these two related appeals, the mother and S.H.'s father raise some challenges that overlap and some that do not. We address each parent's claims separately.

### A. The Mother's Claims

The mother challenges the sufficiency of the evidence supporting the statutory elements for termination, whether termination is in the children's best interests, and whether a permissive exception should preclude termination.

### 1. Statutory Elements

The juvenile court terminated the mother's rights under Iowa Code section 232.116(1)(f) (2023). To terminate a parent's rights under this section, the court must find (1) the child is at least four years old, (2) has been adjudicated a CINA, (3) has been removed from the parent's physical custody for at least twelve of the last eighteen months or the last twelve months with no trial period at home thirty days or longer, and (4) clear and convincing evidence establishes the child cannot be returned to the parent's custody at that time. Iowa Code § 232.116(1)(f). The mother concedes the first three elements, leaving for our review only whether clear

and convincing evidence supports the juvenile court's finding that the children could not be safely returned to her mother's care at the time of the termination trial. *See In re S.O.*, 967 N.W.2d 198, 207–209 (Iowa Ct. App. 2021) (discussing this element and analyzing the mother's ability to "offer a safe and healthy atmosphere").

The elephant in the room is the mother's long history of substance abuse, which has been punctuated by periods of sobriety before relapse. We commend the mother for seeking in-patient treatment and participating in Alcoholics Anonymous. But the few months of sobriety leading up to the termination trial, weighed against her history of relapse and recent positive test for marijuana use, convince us—like the juvenile court—that the children cannot be safely returned to the mother's care. We also appreciate the county attorney's argument below that the recent marijuana use does not factor into this case as just an isolated instance of drug use. The evidentiary value of that incident goes more toward the explanation offered by the mother, which is either false or reflects that she was attending parties where controlled substances were abundantly available despite claiming complete dedication to sobriety. Whether she lied about the positive test result or it was the product of poor decision-making, the marijuana incident and the mother's recent incarceration underscore that she has not achieved the long-term sobriety and stability required to safely care for the children.

In addition to the substance-abuse concerns, the mother's visits remained fully supervised as of the termination trial. This too weighs against returning the children to her care. *See In re C.N.*, No. 19-1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020) ("[The mother] never progressed to unsupervised visits or

trial home visits. Without this necessary progression, we cannot say the children could have returned to the mother's care."). While the mother undoubtedly made some recent strides toward reunification, we agree with the juvenile court these efforts came too late in the multi-year life of these cases.

## 2. Best Interests

When determining best interests, we give primary weight to "the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). Contrary to the mother's argument on appeal, we are convinced the evidence proved termination serves the children's best interests.

"It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010). Yet that is what the mother requests. She hopes her recent sobriety continues well into the future, as do we. But the hope that a mother will someday be ready to parent these children is a legally insufficient basis to overturn the termination. *See id.*

In weighing the competing considerations, we are persuaded by the need for stability and permanence. "It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (citation omitted). These cases have been ongoing for five years; E.C. has been involved with the juvenile court almost since birth, and the prior CINA litigation for S.H.

combined with these proceedings has run much of his life. The State says it well, observing that it is time "to get off of the rollercoaster" caused by the mother's inability to provide stability and necessary care.

In addition, we—like the juvenile court—also give weight to S.H.'s view, expressed through the GAL, that he does not wish to be returned to his mother and wants to remain with his current placement. As the juvenile court put it, S.H. "is understandably skeptical of [the mother]'s ability to keep him safe in the long term." We also credit the candid, forthright testimony of E.C.'s father, in which he acknowledged that E.C.'s current placement (in a foster-care placement shared with S.H.) was the best and most loving environment she had been in throughout her life. Unlike the blame levied against the foster parent by S.H.'s father, E.C.'s father was convinced the children would "thrive" in that placement, which the record supports. This also weighs in favor of the children's best interests supporting termination.

### 3. Permissive Bond Exception

Section 232.116(3) includes certain permissive exceptions that would allow the juvenile court to decline termination despite a case otherwise meeting the statutory elements. One of these exceptions allows the juvenile court to decline termination if it "would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that—without more—neither a parent's love nor the mere existence of a bond is enough to prevent termination.

*See id.*; *In re A.B.*, 956 N.W.2d 162, 169–70 (Iowa 2021); *D.W.*, 791 N.W.2d at 709.

This is the entirety of the analysis put forward by the mother in her bond challenge on appeal:

> E.C. has a strong bond with her Mom.  To sever that bond would be detrimental to the children's future well-being and may cause harm to a young child just beginning to go through life.

Assuming without deciding that these two sentences are adequate to invoke appellate review, we reject the claim.

The juvenile court considered this argument below as it pertains to both children:

> The bond between [S.H.] and his parents has been severely damaged.  He has made it clear that he believes he is best served by his current placement. . . .  There is a bond between [the mother] and [E.C.].  That bond, however, is not so significant that it overrides the need for permanency through a termination of parental rights.

In our de novo review, we agree with that assessment.  The mother has a limited bond with S.H., and it is not clear the bond they do share is positive.  As for E.C., the mother has not carried her burden to prove the loss of their bond outweighs the considerations warranting termination.  As the juvenile court said, "any potential harm to the children from the loss of their parents will be ameliorated by placement in a safe, loving, permanent adoptive family."

## B.  S.H.'s Father's Claims

In addition to advancing the same or similar claims advanced by the mother, S.H.'s father also asserts the juvenile court abused its discretion when it denied his request for new counsel made shortly before trial.

### 1. The Last-Minute Request for New Counsel

The right to counsel is not absolute, and to be entitled to new counsel, an indigent litigant "must demonstrate a sufficient reason to substitute a new attorney for the attorney appointed, such as an irreconcilable conflict with the defendant, or a complete breakdown in communication between the attorney and the client." *State v. Kirchner*, 600 N.W.2d 330, 333 (Iowa Ct. App. 1999). Iowa courts are required to "balance [a party]'s right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *State v. Webb*, 516 N.W.2d 824, 828 (Iowa 1994) (citation and internal quotation marks omitted). "Last-minute requests for substitute counsel, insofar as they constitute a delay tactic, are disfavored." *State v. Tejeda*, 677 N.W.2d 744, 750 (Iowa 2004); *see also In re A.W.*, No. 17-0917, 2017 WL 4049236, at *6 (Iowa Ct. App. Sept. 13, 2017) ("Appointing a new attorney minutes before the termination hearing would delay the proceedings and cause more hardship for [the child]."). "For these reasons, the court has considerable discretion in ruling on a motion for substitute counsel made on the eve of trial." *Lopez*, 633 N.W.2d at 779.

On June 5, 2023, the juvenile court received a lengthy handwritten letter from S.H.'s father making generalized complaints about his attorney. Although not a model of clarity, the letter requested a new court-appointed attorney "just in case [the appointed attorney] decides she can't figure out how to make an appointment in person." The letter also requested to postpone the trial "till I can discuss with [the current attorney] or new attorney." On June 12, the court received another letter making similar requests. On June 14, the court entered an order denying the requests made in the letters. The court found S.H.'s father's court-appointed

attorney "ha[d] been appointed to represent the father in the underlying CINA case since May 2018" and "ha[d] done a good job of representing [the father]." The court also made a finding that "[i]t would not be possible for a new attorney to be adequately prepared for trial in just seven days." In the subsequent termination order, the court expanded on these findings, explaining that S.H.'s father's attorney "ha[d] consistently been a zealous advocate" for him.

On June 21, S.H.'s father filed another letter with the court, now requesting a new judge, a new lawyer, and a new trial date. His attorney also moved to withdraw. An in-court colloquy the morning of trial revealed that the father's complaints about the judge resulted from her rulings. As for his complaints about the attorney, he admitted his attorney "d[id] a good job," but they weren't "seeing eye to eye" and he felt like another attorney "could be . . . better." He also told the court, "I might get another attorney and might not think she's doing a good job either." The county attorney expressed sympathy with the attorney's desire to withdraw from a case where her client no longer wished for representation, but resisted any continuance in the interest of obtaining permanency for the children. The GAL also advocated that the trial should go forward on that date, noting "the timing of this [motion for new counsel] is suspicious, at minimum." In the GAL's words, "these kids need permanency more than almost any kids that I've ever represented," and he resisted any delay on that basis.

The court denied the father's requests on the record, noting that disagreement with the court is not a reason to disqualify the judge, the court-appointed attorney had met with S.H.'s father in-person and represented him well, the filing of motions "within ten days or less of the actual termination trial is telling,"

and granting the motion and a resulting continuance would be "contrary to the best interests of the children." The court also allowed S.H.'s father to ask questions of witnesses as if he were self-represented until his disruptive behavior required the court to remove him near the end of the proceedings.

We see no abuse of discretion in denying the last-minute motion for new counsel. Implicit in the court's decision is a finding that S.H.'s father was engaged in a delaying tactic, which is bolstered by the observations of the GAL and the timing of the request. We defer to this finding and the discretion it conferred upon the court. *See Tejeda*, 677 N.W.2d at 750; *Lopez*, 633 N.W.2d at 779; *see also In re Z.E.P.*, No. 03-0616, 2003 WL 21459565, at *2 (Iowa Ct. App. June 25, 2003) (affirming denial of motion for new counsel when "motion to withdraw was made on the eve of trial," "granting the motion would have resulted in further delay," and there was "no evidence in the trial record that [the] attorney did not adequately represent [the parent] at the trial"). We also agree with the juvenile court's observation that the necessity of a continuance, if new counsel were appointed, was a valid concern given the strong need to afford these children permanency after more than three years of juvenile proceedings.

We recognize that part of the attorney's argument to withdraw below (repeated on appeal) is that her continued representation of the father after his request she withdraw violated the rules of professional conduct. But we do not agree. While the rules of professional conduct provide that an attorney "shall" withdraw from representation if "the lawyer is discharged," the comments expressly recognize that special circumstances inhere in the relationship between a court-appointed attorney and indigent client. *See* Iowa R. Prof'l Cond. 32:1.16(a)(3).

"Whether a client can discharge appointed counsel may depend on applicable law." *Id.* cmt. 5. We see no unethical conduct committed by counsel and find the rules of professional conduct do not undermine the juvenile court's decision or provide any basis for reversal on appeal. And we share the juvenile court's observation that, despite the father's complaints and generally difficult behavior, counsel has continued to advocate zealously on his behalf through this appeal.

Last, we acknowledge the State's argument on appeal that, even if there had been error in denying the motion for new counsel, S.H.'s father cannot prove prejudice. We agree a showing of prejudice is required. The only allegation in the petition on appeal that prejudice resulted from denying the motion for new counsel is that S.H.'s father "believes the harm suffered is that he would have prevailed at trial had he been represented by a different attorney." "When complaining about the adequacy of an attorney's representation, it is not enough to simply claim that counsel should have done a better job." *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994). Absent any argument about specific deficiencies in counsel's performance, which S.H.'s father could have articulated on the record below or on appeal, we find the lack of prejudice independently requires we deny relief on this claim.

### 2. Statutory Elements

The father purports to make a challenge to the statutory elements, essentially arguing that S.H. should be placed with the mother until he is released from prison. The State contends the father lacks standing to challenge termination of the mother's rights, as he conceded below and concedes again on appeal that he is not presently able to care for the child. We agree with the State. *See In re D.G.*, 704 N.W.2d 454, 460 (Iowa Ct. App. 2005) (applying the principle that one

parent cannot assert facts or legal positions pertaining to the other parent as the court makes a separate adjudication as to each parent). This claim is barred as a matter of law, and we do not consider it.

### 3. Best Interests

Assuming without deciding that the father can raise a best-interests challenge despite his concession and standing problem on the statutory elements, we would find termination is in the child's best interests for largely the same reasons that pertain to the mother. S.H.'s case had been open for five years by the time of trial, he experienced multiple removals, and he has spent much of his life outside his parents' care. We share the juvenile court's observation that S.H.'s father's belief that he will be out of prison in a matter of a few months and able to resume care of S.H. is "fantastical." And we agree with the juvenile court's observation that S.H.'s father did not substantially comply with any case-plan expectations or services.

S.H. deserves the stability attendant to termination and wants to be adopted. This outweighs the hypothetical possibility that perhaps someday, after a release from incarceration at an unknown time, his father will become a suitable parent. *See A.B.*, 815 N.W.2d at 778; *P.L.*, 778 N.W.2d at 41. In short, S.H. has been in limbo long enough, and his best interests are served by termination of the father's rights.

### 4. Permissive Exceptions

S.H.'s father makes a challenge drawing on the permissive exceptions in section 232.116(3), while recognizing none of the facts he developed fall neatly into one of the buckets crafted by the General Assembly. *See* Iowa Code

§ 232.116(3)(a)–(e) (providing five exceptions: when a relative has legal custody; the child is over the age of ten and objects; there is clear and convincing evidence terminating a close bond would be detrimental; the child requires placement in a hospital or similar facility and declining termination will not hamper a permanent placement; or the parent's absence is caused by admission or commitment to a health facility or by the parent's military service). We note in reviewing this claim that many of the facts asserted in this section of the petition on appeal appear to be based on the father's testimony at trial, which the juvenile court impliedly rejected as not credible throughout its ruling. We give weight to that credibility determination. *D.W.*, 791 N.W.2d at 706. But even if we set aside our deference to the fact-finder, we would not be persuaded given the other credible record evidence. We have considered the applicable exceptions, as well as the other circumstances presented by the father, and we affirm the juvenile court's determination no exception applies. *See In In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018) (discussing the permissive exceptions and when they apply).

## IV. Disposition

We affirm the termination of the mother's parental rights to both children and the father's rights to S.H.

**AFFIRMED ON BOTH APPEALS.**